The Court will call its next case, United States v. Small. Good morning, Your Honor, and may it please the Court. I want to wait for your answer. Just take a moment to get a seat. All right. Keith Donohue on behalf of Garnett Small. If I may, I'd ask to reserve three minutes of my time for rebuttal. Your Honors, in this case, Garnett Small endured severe and unjustifiable delay. At each of four hearings over a period of more than four years, he asked to be sentenced forthwith. But he asked for continuances during, like, three years of that period. Correct. Well, yes, but I want to bring... Before that period. Well, during that... Actually, you're right. During that period. During the three-year period. Well, I want to... The reason it's important to look to all four hearings, including before the three-year period, is because at the first sentencing hearing, the District Court, from the outset, literally within minutes of going on the records, stated it wasn't very inclined to impose sentence that day. And throughout that hearing, Defense Counsel argued strenuously that the District Court should impose sentence that day. It informed the Court that Third Circuit law was clear, that my client was not subject to a 15-year mandatory minimum, but rather a 10-year maximum. And I would submit, it remonstrated with the Court at that point, as the Court became clearer and clearer that it did not wish to proceed. Finally, with the Court having made elusively clear that it was not going to proceed at that time, then for a period of years, Defense did acquiesce in the delay. Well, did Defense just acquiesce? I mean, wasn't it Defense who moved to stay pending the resolution of Harris? There were sort of three successive submissions. The first two were letters that were voiced as the joint request of the parties. The third was styled as the defendant's unopposed motion, but it was certainly in spirit joined by the government. And if you look at the October 2021 hearing, the Assistant United States Attorney actually states, you ruled correctly on that motion, the one to continue for pending Harris. So I'm not sure why it was styled as the defendant's motion. I think it may have been a matter of professional courtesy. But the government was not only fully along for this ride, but again, at the first hearing where Defense Counsel intensively asked the Court to proceed, it was the government that effectively suggested there's an appeal pending before this Court. Maybe you want to hold off. And I think at that point really cemented what was already the District Court's reluctance to go forward that day. So to focus on how that one motion was styled, I think, would favor form over substance on this record. But I think the point we're trying to drill on is the fact that after that proceeding in January 2017, it's December 2017, right? December 2017. There were three applications in which the defendant was proceeding with the position. We should hold off on this sentencing. Correct? Yes. The defense went along with what the court had made clear it wished to do. OK, so we have to look at this. Maybe I can revisit it more fully within the frame of the Barker factors. And I think you can look at the defense role and the delay vis-a-vis two of the factors, one being reason for delay, the second being assertion of the right. So as far as the reason for delay goes, if I were to grant the most favorable possible reading to the government of the record, that this is holding my client exclusively responsible for that whole period simply because one motion says defendant's motion. Then we have a situation where we've got about 19 months of delay in which both parties equally advocated for the delay. And that followed the government planting the suggestion that delay was possible. And then later, beginning in October 2020, we have 16 and a half months of delay for which the government is exclusively responsible. And during. How does the pandemic play into this? Were there orders in place at that time relating to what could happen in court, what could happen out of court? And how should we consider that? Well, what you can see from the docket here is that not much of the delay was caused by the pandemic. At most, I'm certain that one delay from December 2020 to January 2021, the docket does say delayed because of Covid pandemic. So that's fair. One and one half months. And I think really that's the only portion of delay attributable. Covid, because when the pandemic emerged, as your honors pointed out, that was part of the period when the defense was concurring in the state. The defense brought that to an end in October 2020. The district court noticed the hearing for December 10th. And that's the hearing that was then continued to January due to Covid. OK. And when I interrupted you, you were going through the Barker factors and I want you to continue to do that. But one question that I have for you relating to that is, do they all weigh equally or how should we weigh certain of the Barker factors? Did this prejudice, for example, weigh greater? What's your position on that? I don't think there's a rule of law that anyone weighs more. I think it's the facts of this case. On this case, I would invite the court to take an approach set out in the second Burkett decision, the 1991 decision of this court. There, the court said that, well, prejudice, he's shown some prejudice. We're not we might be somewhat underwhelmed by his prejudice showing. But on all three of the other factors, they weigh very strongly in his behavior, in his support. And thus we find that there was a due process violation. I think that that might be fair here. I think we've detailed more prejudice than Mr. Burkett did. But I think the delay in this case was longer than in that case. So the length of delay factor weighs more strongly in our favor. The reason for delay is perhaps more something we have to parse more. So I've talked about how I'm granting that, you know, the period July 2019 to October 2020, even if that were all considered to be attributable to the defendant, we still have a much longer period attributable to either the parties jointly or the government exclusively. And the other dimension of the reason for delay factor that I think is significant is, in fact, what reason that this report stated for why it was delaying. And that was to see if the law might evolve to make Mr. Small's subject to greater punishment. Well, let me ask you two questions on that subject. The first is, and I know the question focuses on what the Court of Appeals is doing, but you are aware of the number of appeals that have been held pending the issuance of Harris, correct? Yes. So how can our court criticize parties or the district court for operating in the same way, holding back until that opinion is issued? For two reasons. First of all, because there's meaningful distinction between habeas actions and... Speak up a little bit, please. These are direct appeals. Well, direct appeals from denials of habeas or grants of habeas, I think, in many cases. The government identified a number of cases in its brief. It didn't – it lumped together two categories of cases. One, habeas and direct appeals. I can tell you... But I'll just focus on direct appeals for the purposes of my question. So on direct appeals, I think even when the law is – even if we were to say the law is unclear. When a defendant is asking for his sentence, as here, the district court simply has no choice but to bite the bullet, make its best ruling, and let the defendant be heard before this court... If a district court is duty-bound to make a decision when the law is potentially going to be changed by the en banc court that is above that district court and the Supreme Court on a relevant issue, is there a law that says you need to sentence on the spot, despite these indicators? This change that was possible, was it a change of a greater sentence or a change of a lesser sentence? A greater sentence. Okay. It was only a change of a greater sentence. That's right. And the defendant was, for 16 months, asking consistently to be sentenced. Exactly. And the court was then delaying the sentence because of appeals that there was no apparent date on which it would be decided. But it did not seem like anything that was going to come up in the near future. I think that's exactly right. Now, I can speak of my own experience as a district judge. I would have gone ahead and sentenced saying that this is not a situation where you can sit back and wait because that's too long, this guy needs a sentence. But although I always thought I was right when I was a district judge, I did not create rules for the rest of the Third Circuit to live by. So what is the rule that we ought to have in mind? Should we have in mind whether the change is going to be pro-government or pro-defendant? Does it make any difference? Should we consider whether there is any definite or indefinite date on when a decision is going to be made on the case which is on appeal? Within the 16th month, 16 months, should we set a time limit? Should we say that 16 months is in and of itself too much? What rules do you propose that we take from this case? I would suggest that each of the factors Your Honor has identified, whether it's pro-government or pro-defendant, definite or indefinite, 16 months or less or more, those weigh in the balance. Each of those are relevant facts in the Barker v. Wingo analysis. And here all of them favor Mr. Small, tending to show the reason for delay was invalid. Now, there's no hard and fast rule of law, Judge Schwartz, that requires a district court to rule. But I'm very pleased that Judge Roth made her point. And many other district judges have also done just that. At that first hearing when defense counsel was advocating strenuously to go forward, he identified three judges on the same bench who had done just that in the face of the same argument from the government within the preceding months. What if we flipped it and the state of the law at the time of Mr. Small's sentencing was more harsh and there was an en banc argument that was occurring that should the law of the circuit change, he would have gotten a benefit? Following up on what Judge Roth is asking, should that make a difference? That would absolutely make a difference. Because presumably counsel on behalf of the defendant would say, hold on, Judge, there's a case that's coming that might benefit my client. Right across at least the last three factors that would almost dictate a denial of a defendant's claim. The reason for delay was the defendant's request. He didn't assert his right, but quite the opposite. And he was benefited rather than prejudiced by the delay. So the Barker factors take that kind of account of this. And a critical distinction in this case is that Mr. Small asked for 16 and a half months to go forward. And at hearings that are somewhat striking to read, the district court repeatedly declined to do so, typically expressing its dissatisfaction with the case that the government was attempting to overrule. Well, were they really upset with the categorical approach? That's probably right. Is he in the minority for that? You don't have to answer. We do have a case called Government v. Birmingham and the Supreme Court in the United States v. Ladd-Hawk. And in those two cases, they were speedy trial cases, not speedy sentencing cases. But in both of those circumstances, the appellate court in its part was waiting, was approved a trial court's decision to wait for an en banc ruling on a particular issue. In U.S. v. Ladd-Hawk, it was a Supreme Court case where the court, where there was an approval of waiting for an interlocutory appeal to be resolved in the district court. Don't those cases tell us that it is appropriate for a district court to await rulings that would have a direct consequence on the case? Well, if I grant the premise that there was a question of first impression, then I think that would tend to make delaying at least for some period, and maybe if the defendant wasn't objecting, appropriate. Now, I've labored in my briefing, although I believe I've made the case that this was not a question of first impression. But even if I lose on that, then we know at the absolute least that as of June 2021, the situation cannot be analogized to Ladd-Hawk or Birmingham. That's when Borden came down. At the hearing before that, the government had said, when Borden comes down, that's the end of the road for the government. The district court said, the moment Borden comes down, I'm going to sentence you. Borden comes down, and now the district court says, I'm going to wait to see if the Third Circuit overrules its Mayo precedent. So at the absolute least, those nine months are unforgivable delay. That's seven months after Mr. Small began requesting to go forward. That might bear on what remedy should be awarded if a due process clause violation is found. We would suggest perhaps the whole period of delay should be credited against the sentence. I know I'm very much exceeding my time here. I'm sure my colleagues have some questions. But the court might alternatively try to fix a point at which the delay became so intolerable that it simply cannot go without remedy. The last of those points would be the Borden decision in June 2021. It could also be the first hearing where the district court refused to go forward in January 2021, or the council's request in October 2020. So if we were to fix one of those points, the remedy might be to credit the months that followed beyond that against the sentence. I wanted to ask you about prejudice, if I could. In your brief, you talk about earned time credit. And you talk about inability to access certain rehabilitation programs. Would you agree that the earned time credit could be deemed a bit speculative because there is a scheme by which even to get that credit, there's considerations by the BOP, including recidivism risks? This isn't a comment about your client specifically. I'm simply saying the circuit has already kind of opined that if the prejudice is on the speculative side, we can't really consider that. Would you agree with that? Certainly with that rule generally. And I would agree that there's certainly no guarantee my client was going to get that time. The foremost dimension of prejudice, I would submit, Your Honor, is that my client's been deprived, and there's no remedying this, of a reasonably prompt hearing before this Court on his constitutional challenge to the warrantless search of his belongings. We're not going to argue that point, but we're arguing that subject because we didn't ask you. But all I wanted to ask you on this is, if the Court were to determine that that claim, that the district court was correct in its determination to deny the suppression motion, would that take away that argument? It might diminish it to a degree, but it would not take away that argument. As this Court said in the second Burkett decision, the right-to-do process protects not only the right to a favorable decision, but the right to obtain a decision on the merits at all. And it was quoted in the Supreme Court in Evitz v. Lucey. So Mr. Small has still not had a ruling on the merits, not even one, because the district court, I don't want to litigate the matter, but erroneously held he lacked standing. So that delay in obtaining a ruling, even if this Court were to rule against him, is prejudice. Similarly, would there be prejudice, although it is speculative whether his good conduct would earn him benefits, to be denied the opportunity to accumulate good conduct? Absolutely. And we try to set forth the relevant statutory provisions in our reply brief. And at the absolute least, Mr. Small has been deprived of opportunity to ask for that amount of credit by petitioning the warden. There is a mechanism in the First Step Act to ask the warden, hey, look at my specific situation. And now he can't have earned credit that he might have asked the warden to credit in that fashion. All right. Thank you, counsel. Thank you. Good morning, Your Honor. May it please the Court, my name is Sarah Solo. I represent the United States. We are the appellee. Your Honors, we adamantly believe that the defendant has waived the speedy sentencing claim, that the plain error standard of review applies. And I'm happy to present those arguments. I'm going to ask you just a quick question. You're claiming waiver based upon the plea agreement's waiver of appeal. But the government filed an appeal in this case. Doesn't that open the door to allowing this appeal to proceed? Respectfully, no, Your Honor, because the language of the appellate waiver speaks in the present tense. And it says, and this is at Appendix 171 to 172, it says, quote, if the government appeals the sentence, then he can appeal. And then it says, if the government does not appeal. It's speaking in the present tense. It doesn't say if we have appealed. We withdrew our cross-appeal. That was granted by the clerk of this Court on March 13th. But he filed an appeal. Yes, but we are not appealing now. We are not appealing anything. We are the appellee. Filed an appeal. But he filed an appeal. I think you've got better arguments to work on. And I'm happy to move to those, Your Honor. If we can move to the plain error. I'm not sure how you can argue plain error should apply here when Burkett simply says a defendant has to be tenacious in its request for movement of the matter. And there's no doubt that at least since October of 2020, that action occurred. So do you really want to rely on plain error as well? We think plain error applies, Your Honor. And then we'll move to the merits. But because Rule 51N says that a party, to preserve an objection below, a party has to state the grounds for that objection in the district court. Never do you see anything in this record about the invocation of Rule 32, which is the rule that says the Federal Rule of Criminal Procedure, the court must impose a sentence without a necessary delay. There's no mention of the due process clause, of Barker. There's never a claim, I have a speedy sentencing claim. There's just back and forth about let's schedule the sentencing. So we don't think under 51N that that's appropriately preserving the claim, making clear what the grounds are. You can't just in the abstract talk about something. You have to. And they cite the Lacerda case, which is a decision of this case in 2020, or a recent Third Circuit case where you did apply de novo review, you found that the speedy sentencing thing had the claim had been preserved. They filed a speedy sentencing motion in that case. So that is what you expect to see. Wasn't that what his letters were? And they weren't in the form of a notice of motion, but those e-mails said, please sentence me. They said, please sentence me. They did not invoke Rule 32. They did not invoke the due process clause. They did not put the court on notice that he's making a claim of deprivation of rights. But the district court sure acted like it was that this was such a claim, because for every letter that was written, two or three days' letter, the district court judge set a proceeding. Now, whether that proceeding proceeded or not depends on where you are in the docket. But certainly the district court was reacting as if there was a request for expeditious treatment, correct? Yes, Your Honor. Still, we don't think it's preservation in the way that the Rule 51N entails and intends. But I'd like to move some merits, because we think we just across the board prevail on the merits. The four Barker factors which apply here require Factor 2, an unreasonable delay, and then prejudice. We don't think there's either. Let me ask you a question. On page 43 of your brief, you say, a district court may generally set the sentencing date at its discretion so long as it is not attempting to change a law applicable to the sentence. Looking at that transcript, is that what the district court was doing here, ignoring the clear precedent in hopes that the court would have overruled itself if it waited long enough? Absolutely not, Your Honor. With respect, if you look at the different points in time where the district court was wrestling with what to do, it's waiting for clarity from the Third Circuit or the Supreme Court on one of the most complex issues that has roiled this court, this circuit, circuits across the federal courts writ large. I mean, Harris itself, which has been pending in the Third Circuit for six years, that's unprecedented. And this is not a regular sort of speedy sentencing Barker case. This is, just to take a step back of the context of this case, this is one of the most complex issues. The categorical approach, how it affects all of its dimensions, how it affects so many different types of criminal defendants in, you know, under the guidelines, under here ACCA. And so the district court was really weighing with this in-flux law on what to do. Now, if you look at December 2017, the first sentencing, I think the characterization of what was going on then is not quite fair for my opponent. You had just had the Voisin case in the Supreme Court in 2016. You have five courts of appeals, and one the other way, but five. Most saying, wait a minute, Voisin changed our law on recklessness. Post-Voisin, recklessness crimes do count for ACCA status. Court of appeals, up to court of appeals, up to court of appeals. And then pending in this circuit, you have Santiago. We had just filed our brief in April 2017. Now it's December 2017. We're the Third Circuit's looking at that exact question in the context of New York statute, saying, oh, does Voisin mean that recklessness crimes like this one now count for ACCA? So the district judge is saying, well, I know the court of appeals is looking at this right now. I could just guess or make up my mind, or I could apply the old law. I could apply the Third Circuit precedents, Tran and whatever else. But I know the Third Circuit is looking at this right now, post-Voisin, and five courts of appeals have all held that Voisin changed their law. And we're not just making this up. The Supreme Court in Borden in 2020, Grants Borden, 2021 decides it, says in footnote one or two, here's the circuit split that developed post-Voisin with five circuits going in the government's direction and two not. So we're standing in front of a district court judge, Judge Goldberg, in the middle of this post-Voisin C change, saying, you know, there's a case pending right now, Santiago. Why don't we wait? And then the defense agrees by the end of that hearing. In this pending case, was there any way that it could be resolved that would decrease the penalty to which Mr. Small might be facing, or was the only possibility of change an increase? It was an increase. If those recklessness crimes counted for active status and he had two, the robbery and the ag assault, then he would be acting, he'd face a 15-year mandatory minimum rather than a 10-year stat max. So that is the case, Your Honor. But it was a matter of law where after the Supreme Court had this important ruling in 2016, most circuits were deciding to change their rulings. And that is what the district court was wrestling with the first time it decided to delay. Then you have three years of defense continuance motions saying, you know, also let's hold for Harris. They say that in their February 2018 filing, which is at Appendix 347. They say, here's a supplemental sentencing motion from us, and there's another Third Circuit case you should probably hold for. Granted that for three years, the defendant was going along with the continuations. There's 16 months when he's saying, I want to be sentenced. And I think that's what we've got to focus on. I would like to focus on that, Judge Roth, and you raised that before. So let's start. October 2020, that's when Ms. Toplin sends her first email. We want to get to sentencing. Then the judge calls him. It is COVID, as Your Honor raised, and this is October 2020. The courts are effectively closed, but still they find a way to get everybody in a telephonic conference in January 2021. And the judge says, should I just sentence the defendant today? At this point, Borden had just had oral argument in November, two months before. And Borden asked the question presented, do recklessness crimes count for ACCA? It's a very question that affects his entire sentence because he has two. And so if they count, he has 15 years. If they don't count, he has a 10-year sentence. Even if we agree with you, how do we get past June 2021? Okay, so they say let's wait for Borden. June 2021, we write a letter, Bob Zausenmer, my appellate chief, in August. Right after Borden comes down, Ms. Toplin sends an email in July. We have Borden let's sentence the defendant. We then raise for the court. There's another reason to hold, which is the Anven court, this court, and Harris had just added two questions for the parties to brief in July, and we did. We filed those briefs in July 2021, saying Borden had left an exception for extreme recklessness crimes, that they still could count for ACCA status. And we are now telling the Third Circuit, Pennsylvania first degree AG assault, his prior, is an extreme recklessness crime because it involves manifest indifference to the value of human life. So our argument in the Third Circuit is, wait a minute, we understand Borden, but there's this exception in footnote four for extreme recklessness. Let us brief this, present it to the Anven court. And so we tell Judge Goldberg, we understand Borden came down, but we still think his prior counts. We're briefing at Anven to the Third Circuit right now. He thinks about that. We all get together in October. There's another conference. At this point, Harris gets even more complicated. The Anven court remands to the panel. They certify a question to the Pennsylvania Supreme Court, and I think Judge Goldberg says, we just can't wait on this anymore. And then we have the sentencing hearing that March. So if you want to look at the June 2021 to the March 2022 period, I don't think it's delay. It's us saying, we've held this long, and now Harris is still going to resolve this question about extreme recklessness in this Pennsylvania AG assault statute. And then the judge is thinking about it, and there's a conference in October, and then he just moves to the sentencing in March. I do think that's the toughest period of delay to wrestle with. But I think taking a step back, Your Honors had raised questions about, is there any case law that says it's unreasonable for a district judge to wait as an appellate court or the Supreme Court is deciding the question presented in the case? No, there's no law that says that. There's no case that says that. That's what district courts do all the time. And I don't think we would want there to be a rule of decision saying, you just got to rush into a sentencing. Right now, the Court of Appeals is deciding the very question that you have to answer, Judge, but just guess or figure it out, and then it'll get appealed and remanded. I mean, I don't think that promotes the orderly administration of justice. And here we had made very clear that, however the judge ruled, we were going to appeal, or they were going to appeal. And then the case would just be pending on appeal one way or another, and if Judge Goldberg guessed it wrong, it'd have to come back for a resentencing and redo it all over again. So I do think he acted cautiously and reasonably, and then when it became clear that Harris had gone on for six years, he just said, I have to proceed to sentencing in March 2022. So, and also, Your Honors, if you look at the Barker case law, when is the delay unreasonable? When is it held against the government, held against the court? It's when you see a deliberate tactical attempt to hamper the defense. It's not when you're waiting for a case law to be resolved. Granted, Judge Roth, this was case law that would not have benefited the defendant, but the facts could be reversed. It could be case law that it would have held he's not acting before it definitely would have been. And either way, when a district court is sitting there and it knows the panel above is deciding the very issue, it is reasonable to wait. Here we just have this extraordinary situation of a six-year pending court of appeals case, which is pretty unprecedented and happened to take a very long time and is still ongoing. And finally, it went to the Pennsylvania – well, you mean Harris. Harris. Yes, Your Honor, Harris. Went to the Pennsylvania Supreme Court, which in essence decided it. We take the position not entirely, Your Honor. We're still arguing. Are you speaking at a certain time when you've got to say the handwriting is on the wall? Well, as we have been – as we wrote to the court in Harris, every single court of appeals post-Borden, looking at these extreme recklessness statutes like Pennsylvania first-degree ag assault, say that they do count for ACCA. And the fact that a woman can starve her child to death because not feeding them for four years doesn't mean that nobody ever convicted of aggravated assault in the state of Pennsylvania. Well, it really depends on what Pennsylvania charges the defendant with because Pennsylvania does have an assault charge that includes recklessness, which is what Harris said. So why should we try to put that element into the Pennsylvania statute when we've got a statute that covers it pretty well? And you're complaining really about what the Pennsylvania prosecutors are choosing to charge people with rather than what law exists in Pennsylvania. Now, that is beside the point that is entirely unnecessary in this case. But it was my reaction in reading Harris. Your Honor, Harris is one of the most complex cases that trying to get into that whole record and understand what's going on has challenged me. But I do think the argument we're saying in Harris is that a first-degree aggravated assault in the state of Pennsylvania, which requires intent, knowledge, or extreme recklessness and manifest disregard to the value of human life, is a crime that involves the infliction of physical injury on another person that should count under ACCA. And we do think we are right to continue to argue that in the Third Circuit. We might lose. But that, because that issue was pending all along in front of the Third Circuit, would directly control one of his predicates, counting. That's why the judge held. If I could address prejudice, I'd like you to do that. Your adversary focused on prejudice by the delay in appellate review of the suppression order. Is there prejudice? No, there is no prejudice in that, Your Honor. Nothing during that four-year period changed any argument he could have made or would have made. In the Barker case itself, which is the Sixth Amendment case, the Supreme Court held that a four-and-a-half-year delay in just getting to trial, anxiety and waiting around, that wasn't even enough in Barker in the Sixth Amendment context. What the court – what the cases teach us – and Burkett, this Court's decisions in the first and second Burkett decision state this – the prejudice has to be substantial. We are not in a Sixth Amendment posture. We are in a post-conviction posture. And so the typical things that the Speedy Trial Clause protects are not really in place. And you really need to show some substantial prejudice to an argument the defendant would make, to his or her ability to rehabilitate in the community. And just waiting to file an appeal where no argument that you would make or no evidence or facts that you would present are affected is really not enough for prejudice. The other forms of prejudice they talk about are being in the FTC or Lehigh County as opposed to the ultimate place of BOP designation. With respect, Your Honor, this – I'm in this jail rather than that jail. Betterman itself, the Supreme Court decision, just ends any debate about that. The footnote of Betterman says, and I quote, that there is no cognizable due process clause interest. It's of no constitutional moment for a convicted defendant has no right to service persons in the penal institution he prefers. To the extent that the second Burkett case in 1991 sort of wrestled with whether local jail versus other state prison could create a prejudice that gives rise to a speedy sentencing claim coupled with other things, Betterman says it doesn't. There's no constitutional right to get to one jail or the other jail faster or slower. Okay, but that is after you're sentenced. And here we're dealing before you're sentenced. And it's a different world. And the fact that you're kept in pre-sentence type prison because you haven't been sentenced and have no opportunity to go to either a penitentiary or a county jail after sentence, where Betterman says you can't complain between the two, but Mr. Small is complaining because he can't get up to that point in the first place. But that's exactly what the defendant was saying. Betterman was a speedy sentencing claim, saying the exact same thing, that I had to wait in this jail longer before I could get to my state. This was Montana. To my state jail, which there's more visiting privileges and the law library and it's just a better place to be incarcerated. And the Supreme Court says you have no cognizable liberty interest under the Due Process Clause to make that claim in the same posture that Mr. Small is in. But the federal penitentiaries have certain programs and acknowledgements of prisoner rights that I guess he wasn't going to a federal penitentiary. Was he going to a state penitentiary? No, he was going to a federal. United States. United States, yeah, that simply are not available in the pre-sentence. So to me there is a deprivation of an acknowledged right once you get into a federal penitentiary that is different from the right that is presented in Betterman because there is nothing that has been established that you have a right to that you're being deprived of. With respect, Your Honor, I do think that Betterman forecloses the argument. Another case on point is a case of this circuit, which we don't cite in our brief, but I would just like to put in the argument record the Hakeem v. Bayer case. It's a Third Circuit case from 1993, 990 F. 3rd at 750, where this was a speedy trial case, but the defendant there was saying I spent 14 months in a local jail and not the final jail where I would get to which would have more programs for me. And that's two years after the Burkett II case, and the Third Circuit says no. Even in the Sixth Amendment context, that's not a constitutional violation in the prejudice prong. Distinguishing between cases where a defendant, because of the type of jail they were in, couldn't locate an alibi witness, something more than just the type of prison you're in, you have to be affected by it. You can't make some argument on appeal, on retrial, at trial. That's the type of prejudice that matters, not this jail versus that jail. Then Judge Alito in Burkett in the 1991 case in dissent has a point of view that's adopted by Betterman, ultimately 16 years later, where he says the place of designation should rarely, if ever, create a liberty interest because it would turn district courts into rating agencies of penal institutions. And if you were to create this rule of law here, Your Honor, you'd have every defendant now running into district court saying you have to sentence me right away. The PSR is taking too long. Locating witnesses for sentencing is taking too long. I'm in the FTC. I've got to get to the BOP facility somewhere else because they have more visiting privileges. And I'm getting a speedy trial violation right now with every month that goes. That's just not how we want our sentencings to work. And it's a little different where the programming that might be available at the Federal institution could have an impact on liberty, i.e., it could reduce the time of incarceration. So is that different? No. But, Your Honor, with respect, on this First Step Act argument, that it has this statute has now created a due process clause constitutional right to get sentenced quicker so you can get to jail quicker and maybe get out quicker. This would surely be the first case to ever say that, and it should not. No district judge, and respectfully, not this panel, could possibly forecast whether a defendant will earn time credits under that statute, participate in the recommended programming, become a minimum or low pattern. So this is a speculative problem. It's piling speculation upon speculation. And just taking a step back about the statute itself, I think the Court could take judicial notice of the fact that the First Step Act, it creates this earned time credit program. Forty-five percent of all 143 Federal defendants, 45 percent, about half, are not even eligible to get time credits because they have offenses of conviction, really violent things, that Congress in that statute made ineligible. So this is not some vested interest in every defendant to earn time credits. Half of them don't even qualify. Then to earn time credits, you have to do the programs. You get to BOP. You get your pattern score. You get a needs assessment. I worked on this role for a year and a half in part of being justice. You get a needs assessment, and it says here are all your needs. Now you have to go do programming that matches your needs. For 30 days, you have to successfully participate in the programs recommended for you. You can't opt out. You can't get in shoe segregation. You can't get BOP infractions. You can't get in fights. Many of those things happen. You don't earn time credits. Then if you do this for years and years and years, if you work your way to a minimum or low for two pattern scores, then you can earn time credits towards pre-release custody. Your sentence doesn't get chopped off. You go to a halfway house earlier. It is piling speculation upon speculation. It's just a guess. Will this person be eligible? Will they participate in the programs recommended to them? And for the record, Your Honor, this defendant has accumulated five BOP infractions in 2022 alone. He's probably the least one. That's not in the record. Is that in the record? No, Your Honor. Would you agree that's not in the record? I agree. And his own disciplinary history is not in the record, right? Well, the PSR with his disciplinary history at the time was prepared in November 2017 before the December 2017 hearing. So all the stuff that happened after as he was waiting in the FTC and now in his place of incarceration is not in the record because the PSR only reflected the prison infractions at the time of the PSR. So, yes, Your Honor. Is the PSR in the record? I don't think it was filed in the joint hearings. Yeah, right. It was referred to at the sentencing hearings, Your Honor. And there were some infractions referred to. And I only bring it up because, as an officer of the court, I think they're making a speculative argument. And we felt we say at page 50 of our brief that if that speculation was to ever prove not borne out, it's here where we have him categorized as high with all these prison infractions. He's the least one. It's not in the record. I prefer you not to mention it because we can't consider it. So you might as well just not mention it, okay? Yes, Judge. But as a legal matter, we don't think that the possibility of speculatively earning time credits under the First Step Act should create a cognizable due process clause liberty interest to get sentenced faster when a judge is waiting for pending appellate or Supreme Court decisions on a legal question that will affect the defendant's entire sentence. We don't think that the type of prejudice recognized by Barker, Burkett, the other appellate case law is of this ilk at all about the type of prison experience that one has or a brand new statute where there's a lot of speculation that goes into whether someone earned something. Okay. Let's just see if my colleagues have any other questions. I do have one more question. Yes, Judge. If we disregard the first three years because the defendant acquiesced, can we consider the whole period that he has not been sentenced, the whole five and a half years, even though he acquiesced in the first three years, or can we only consider failure to sentence during the last 16 months? Certainly the latter, Your Honor. The case law holds that when you're weighing the four Barker factors and you're counting the period of delay, if you find that part of the delay was caused by or acquiesced to by the defendant, you only call it a period of delay when it counts against him because he, you know, didn't object or, sorry, was objecting and then there was something unreasonable and prejudiced in hearing. I want to make sure I understand. Specifically, so the first factor is the time of delay. Are you saying that we would, on the first factor, we would not say four and a half or five and a half years? We would say 16 months? Or are you saying, no, when you're looking at the reasonableness factor, the reason for the delay is how you account for the three years? I think the latter. Sorry, Your Honor. We have to count what happened. So it's four and a half years between the change of plea and the ultimate sentencing in March 2022. But when you then assess whether it caused him prejudice and led to a speedy sentencing claim, we don't think any of it did. But if you wanted to say for three years he acquiesced and so we're not going to count that, then you would only look at the period of delay, the 17 or 16 months from when they started to, when Ms. Toplin sent her October 2020 email. But we just reiterate, then, for the next nine months, you had Borden pending and waiting for a Supreme Court decision, which you know will issue. And that's one thing, Your Honor, Judge Roth, you mentioned before, you said, well, in October 2020, this could go on forever. But at that point, we know the Supreme Court was deciding Betterman. And everyone, you know, we know that by June, at the latest of 2021, we're going to get a Supreme Court ruling. So I do think there was some definitiveness to that waiting period that the district  Borden, right? Borden. I'm sorry. That's okay. Borden. Thank you, Your Honor. All right. Thank you. Your Honors, there were a number of misstatements in the preceding presentation. The most grievous one concerned the period from June 2021 onward. Okay. There was three or four minutes of discussion about extreme recklessness. That's not an issue. It was clear from June 2021 onward that Mr. Small's aggravated assault conviction did not qualify as a predicate on a wholly different ground, namely the ground stated in the Mayo opinion. Were Mayo ever overruled, I would then be arguing aggravated assault is not a predicate because it can be committed recklessly and the government would argue extremely recklessly. But Mayo would have to be overruled for that question even to come to the floor. So I do want to stress that there's certainly no confusion about what the law was from June 2021 onward. The Harris case at this point, inasmuch as it was going to have application here, would have concerned only the overruling of Mayo. So is that why? So I hear exactly what you're saying about Mayo was the law of the land at the time Harris was still in this unknown state. Yes. Correct? Right. So there was a prospect that this court would overrule Harris and then the concerns that Judge Roth is bringing to the floor would have been magnified. Maybe Mr. Small would have been hurt by that after he's been asking for so long to go forward. And he got held for nine months even after that was the only reason that he could have potentially been exposed to a greater sentence. The record is clear on that. There's no debating that. So by the same token, to characterize the district judge as having come into these hearings and said, can I impose a sentence now, and the parties being kind of equivocal about it, is inaccurate. The district court from December 20, 2017, made it clear it was loathe to impose a non-ACCA sentence and did everything it could to delay the proceedings in precisely the way that the government's case says is improper, i.e., deferring sentencing so as to give the defendant harsher or, for that matter, lesser punishment. But here, it was harsher punishment. On the law of due process. I can't be read as simply saying the judge wanted to ensure it was a one-time only sentencing proceeding and didn't face what your colleague had described as going up and down and up and down because the law would change. Why isn't that a fair inference from the same record? Because you're inferring that the district court judge had a mission to max out your client. Why isn't the same inference, maybe the judge wanted to sentence once and make sure that sentence was in compliance with the law as it is? Well, the problem with that is that Mr. Small is demanding to go forward. So when you have that situation, as I was saying earlier, you have to bite the bullet. You might have to sentence twice, but as was pointed out as early as December 2017, three other eastern district judges bit the bullet and took that prospect. With respect to the recent Lewis case that was before this court concerning a sentencing guidelines issue of broad significance, while that case was pending, three different district judges across the circuit, in order to be able to proceed promptly to sentencing, issued reporting opinions deciding the issue they knew full well they might get reversed on in Lewis. And that's just reported opinions. There may be dozens of cases where judges impose sentence and stated they're ruling orally. So I think with Mr. Small asking to go forward, it just wasn't the district court's prerogative to say, I don't want to come back, or you're going to sit up there. It really, because it's the court's and government's responsibility to bring the case to sentencing, it had no genuine option but to do that. Not as a rule of law, but in relation to these Barker rewingo factors. Does the Court have any further questions? No. Okay. Thank you very much for your argument. Thank you, Your Honor. Very interesting case. Excellent arguments. Thank you. So thank you both. The Court will take the matter under advisement.